*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re J. J. TWIGG-JACKSON II, Minor.

UNPUBLISHED
May 19, 2022

No. 357691
Calhoun Circuit Court
Family Division
LC No. 2018-000315-NA

In re S. A. ARMSTRONG, Minor.

No. 357701
Calhoun Circuit Court
Family Division
LC No. 2018-000315-NA

Before: LETICA, P.J., and MARKEY and O'BRIEN, JJ.

PER CURIAM.

In these consolidated[1] appeals from child protection proceedings, respondent-mother appeals by right the trial court's orders terminating her parental rights to JT-J, II (JTJ), and SA, her minor children. On appeal, respondent argues that the trial court erred when it determined that petitioner, the Department of Health and Human Services (DHHS), made reasonable efforts to reunite her with the children by providing adequate accommodations for her disabilities. Because we conclude that the trial court did not err when it determined that DHHS provided reasonable accommodations, and thus, made reasonable efforts to reunify respondent with her children, we affirm.

---

[1] *In re J J Twigg-Jackson II, Minor*, unpublished order of the Court of Appeals, entered July 13, 2021 (Docket No. 357691); *In re S A Armstrong, Minor*, unpublished order of the Court of Appeals, entered July 13, 2021 (Docket No. 357701).

-1-

# I. BACKGROUND

In January 2018, DHHS petitioned to remove six-month-old JTJ. DHHS alleged that respondent had not provided proper care and custody, had mental health concerns, had unstable housing, did not have suitable income to provide for JTJ, and had exposed JTJ to criminality. DHHS provided respondent with services with the goal of reunification. Respondent showed only minimal progress, and the trial court changed the goal to adoption by October 2019.

In that same month, respondent gave birth to SA, JTJ's half-sister. DHHS petitioned for termination of respondent's parental rights to SA, relying upon the prior substantiated allegations of improper supervision, physical neglect, and threatened harm as to JTJ, respondent's inconsistent engagement in services as to JTJ, and respondent's inability to rectify the conditions that brought JTJ into care. Thereafter, respondent married a man, who was not the father of either JTJ or SA, and admitted to certain allegations in the petition in exchange for changing the goal as to SA from termination to reunification.

In September 2020, DHHS withdrew its petition to terminate respondent's parental rights as to JTJ, requesting the court to join the separate proceedings and afford respondent additional services with the goal of reunification. Respondent did not demonstrate progress toward reunification and stipulated to changing the goal from reunification to adoption in February 2021. DHHS filed a supplemental petition to terminate respondent's rights the following month.

In May 2021, the trial court held a termination hearing. Caseworkers testified that respondent was provided with numerous services, including psychological evaluations, parenting classes, individual and couples counseling, case management services, drug screens, domestic-violence referrals, employment assistance, and housing assistance. Barriers for respondent included emotional stability, unstable housing, mental health, and parenting skills. Throughout the proceedings, respondent changed addresses. At the termination trial, respondent testified she was temporarily staying with a friend and disputed a caseworker's testimony that respondent had reported sleeping in her storage unit. Moreover, whether respondent was receiving Social Security benefits, or was in danger of losing them due to her criminal activity, was disputed. And while respondent maintained that she had provided verification of receiving such benefits, a caseworker testified that she had not. Respondent also continued her involvement in domestically violent relationships. Respondent had been charged with domestic violence, involving her ex-boyfriend; however, that matter was dismissed as part of a plea agreement in a separate criminal case. Respondent's husband informed a caseworker that he was filing for divorce and planned to obtain a personal protection order against respondent after an incident at his work. Respondent was also in treatment for various mental health issues, including bipolar disorder and anxiety. Respondent disclosed to a caseworker that she had attempted suicide in March 2021 by walking in front of a car. Respondent was injured and said she would check into an in-patient mental health facility, but she did not do so. At trial, respondent denied attempting suicide and testified she was simply involved in a car accident. Moreover, respondent failed to sign a release so that the caseworker could verify that respondent participated in and benefitted from counseling. And although respondent generally participated in parenting time, she became inconsistent with her visits at certain points. While respondent demonstrated some improvement in her interaction with the children, she had unrealistic expectations regarding their abilities. Respondent also missed drug

screens despite being diagnosed with mild cannabis use disorder, which at some point, appeared to be in remission.[2]

After hearing the testimony and reviewing the exhibits, the trial court determined that DHHS established statutory grounds to terminate respondent's parental rights to both children under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (j) (reasonable risk of harm if child is returned to parent's home). The court further found that termination was in the children's best interests. On May 25, 2021, the trial court entered orders terminating respondent's parental rights.

Respondent appeals.

## II. REASONABLE ACCOMMODATIONS

## A. PRESERVATION AND STANDARD OF REVIEW

Respondent argues that the trial court erred when it found that DHHS had made reasonable efforts to reunify her with her children. Respondent contends that DHHS knew she had a learning disability, and therefore, should have provided accommodations at an earlier stage in the proceedings. Respondent further asserts that DHHS failed to provide her with court ordered accommodations. We disagree.

To preserve a claim premised on DHHS's failure to make "[r]easonable efforts to reunify the child and family," as required under MCL 712A.19a(2), respondent had to challenge the case service plan when the trial court adopted it. See *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). Respondent did not raise any issue with accommodations before the trial court ordered them in June 2020. Therefore, to the extent that she argues that the trial court should have ordered DHHS to provide services to accommodate her reading and comprehension deficits before June 2020, her claim is unpreserved. See *id*. Respondent did not, however, have to take any special steps to preserve a challenge to the trial court's findings or decision after the termination hearing that DHHS made reasonable efforts at reunification by providing reasonable accommodations. See MCR 2.517(A)(7).

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. See *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019). But this Court reviews for clear error a trial court's finding that DHHS proved a statutory ground for termination by clear and convincing evidence. See *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous when, even though there is evidence to support it, this Court is left with the definite and firm conviction that the trial court made a mistake. *Id*. Finally, this Court reviews unpreserved claims of error in a termination proceeding under the plain-error rule. See *In re Beers*, 325 Mich App 653, 677; 926 NW2d 832 (2018). To establish her right to relief under the plain-error rule, respondent must show that the trial court committed a plain or obvious error and that the error affected the outcome of the proceedings. See *id*.

---

[2] Respondent had a medical marijuana card, but it expired during the proceedings.

## B. ANALYSIS

A trial court may terminate a parent's parental rights if it finds that DHHS has established one or more grounds for termination by clear and convincing evidence. See MCL 712A.19b(3); *In re Gonzales/Martinez*, 310 Mich App 426, 431; 871 NW2d 868 (2015). But termination of parental rights "is improper without a finding of reasonable efforts," *In re Hicks/Brown*, 500 Mich 79, 90; 893 NW2d 637 (2017), because our statutes impose a duty on DHHS "to make reasonable efforts to reunify a family before seeking termination of parental rights." *Id*. at 85, citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). Indeed, the Probate Code explicitly directs DHHS to "create a service plan outlining the steps that it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86, citing MCL 712A.18f(3)(d). Additionally, DHHS "has obligations under the [Americans with Disabilities Act (ADA), 42 USC 12101 *et. seq*.,] that dovetail with its obligations under the Probate Code." *Id*. at 86. As with other public bodies required to comply with the ADA, DHHS "must make 'reasonable modifications in [its] policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service' provided." *Id*., quoting 28 CFR 35.130(b)(7) (2016). Accordingly, once DHHS knows of a parent's disability, its efforts at reunification cannot be reasonable unless it "modifies its services as reasonably necessary to accommodate [the] parent's disability." *Id*. at 90.

In this case, respondent asserts that DHHS knew that she had a disability from the inception of the case because the first case service plan noted her disability. The record does not support this contention.

The author of the first case service plan noted the reasons that JTJ came into care: a person filed a complaint that respondent was not properly caring for JTJ, and "it [was] reported that she has the mentality of a 13- [to] 14[-]year[-]old." That an undisclosed person offered an opinion that respondent, who was 19, had the mentality of a 13- or 14-year-old teenager did not establish that she had a mental disability that required accommodation. It also did not show that respondent was unable to read or that her cognitive functioning was so low that she could not understand the proceedings without accommodation. In light of respondent's age, the statement may have been hyperbole regarding her inability to make mature decisions. And the remainder of the report included notes that contradicted the claim that respondent had deficits that may have required formal accommodation. The author of the report described respondent as attentive during a contact, adding that she understood the cause and concerns that led to JTJ's removal, and that she participated in the meeting without any problem. Additionally, the contact notes suggested that respondent understood what she was being told by the caseworkers and that she was fully capable of communicating via text messaging. There was even a note that respondent had authored posts to social media, which suggested that she was literate and had functional computer skills. The author also noted that respondent expressed insight into the problems that she needed to overcome in order to be able to parent JTJ.

The notes from later case service plans similarly suggested that respondent was capable of meaningfully participating in meetings, capable of communicating her needs, and had the ability to comply with the case service plan. For example, the author of a December 2018 report opined that respondent's literacy was a strength: respondent "is able to read and write appropriately, this

-4-

is evidenced by her signing and understanding documents provided to her by [DHHS] and Calhoun County Court. She reports that she graduated high school through an online program."[3] Moreover, after respondent's first psychological evaluation, the psychologist did not identify any deficiencies that revealed her ability to read and write or to understand the proceedings was compromised. To the contrary, when he inquired about learning disabilities, respondent informed him that she "used to read words backwards," but no longer did so.

There was no record evidence suggesting that respondent needed special accommodations with reading and understanding documents before the psychologist conducted a second psychological evaluation in April 2020. Accordingly, respondent has not established that it was plain error to adopt a plan that did not include reasonable accommodations before the trial court ordered such accommodations in June 2020. See *In re Beers*, 325 Mich App at 677.

In March 2020, respondent's therapist reported respondent disclosed that she had had an Individualized Education Program while in school and struggled with reading. The April 2020 psychological evaluation followed. It revealed that respondent's Verbal Comprehension Index (VCI) and Working Memory Index (WMI) were "extremely low." Respondent's VCI score indicated that she had "significant weakness in verbal reasoning, general fund of information, and word knowledge," resulting in "significant deficits in her verbal comprehension and reasoning and in her ability to use and understand language." Respondent's WMI score revealed "significant deficits in her ability to encode, temporarily store, and mentally manipulate information in working memory. There are likely difficulties sustaining attention and concentration." Thus, respondent had "tendencies to be easily distracted, forgetful, and to have difficulties differentiating between important and unimportant cues."

Following a May 2020 hearing, the trial court ordered DHHS to "make reasonable accommodations to assist [respondent] with comprehension of services, reading, additional instructions and reminders." The court explained that one-on-one instruction was "needed." Additionally, the court ordered:

> [DHHS] shall provide [respondent] with accommodations to properly help her including but not limited to the following: Read the Case Service and Court Reports to her; Provide additional help in classes she needs to attend or have one[-]on[-]one instruction only; Answer all questions; Explain what is needed and why it is important so that [respondent] understands what she needs to do; Read to her any document she needs to sign and give her the opportunity to review it with her attorney before signing. [DHHS] shall reach out to [respondent's] attorney . . . , if she declines anything that would jeopardize reunification with her children so that her attorney has an opportunity to get [respondent] engaged in that service.

Respondent similarly has not shown that DHHS failed to provide reasonable accommodations once it became aware she had a learning disability that affected her ability to read

---

[3] At the preliminary hearing involving SA, respondent told the court she was able to read the petition. Likewise, during her plea, she affirmed that she was "able to read and write" after being placed under oath.

and understand documents. See *In re Hicks*, 500 Mich at 86-88. The psychologist did not diagnose respondent with being illiterate. Rather, he diagnosed respondent with a "mild" intellectual disability. More specifically, he opined that respondent had significant deficits in verbal comprehension and reasoning, and that she had deficits in her ability to use and understand language. He also remarked that she had problems with her working memory and was easily distracted. Although these diagnoses indicated that respondent needed some assistance, the record did not demonstrate that respondent required additional measures to assist her with understanding her case service plan.

The psychologist recommended that respondent develop an awareness of her deficits and assert herself by seeking help and clarification when necessary. He further recommended that respondent take a notebook/calendar to her appointments so that she could write down all pertinent information and he asked her to develop a support network of people who could answer any questions that she might have.

The psychologist's recommendations reflect his view that respondent was capable of facilitating her own participation in services by taking notes, developing a support network, and asking for assistance when needed. Consequently, the record does not support the conclusion that respondent's impairment was so severe that she needed DHHS to enroll her in remedial literacy classes or provide additional accommodations. In light of the psychologist's recommendations, DHHS could reasonably accommodate respondent's needs by taking extra time to review documents with her, by simplifying the language used in the documents, and by explaining the terms and requirements in a basic manner. It could also accommodate respondent by having someone available to answer any questions she had. The record evidence shows this is precisely what the caseworkers did for respondent after the trial court ordered the accommodations.

At the termination hearing, caseworker Justice Britten testified that she made accommodations to help respondent understand the services and requirements for reunification. Britten made herself available to respondent by text and phone, and Britten answered any questions respondent had. Britten explained court documents to respondent and broke down the concepts involved in the process. Britten reviewed the materials until respondent stated "okay" and had no further questions. Britten reviewed documents that respondent had to sign; and, although respondent did not have her lawyer present for any signings, respondent never asked to have her lawyer present. Britten clarified that it was her understanding that respondent's deficits involved reading and comprehension of paperwork, so she focused on those areas to ensure respondent understood what was expected of her. In their interactions, respondent was able to read. Moreover, Britten spoke to respondent, if not every day, then at least every other day, answering any questions she had. Britten explained to respondent the importance of participating in the case service plan.

Britten's testimony established that DHHS made accommodations for respondent's deficits that were consistent with the psychologist's diagnosis and recommendations. Britten spent additional time with respondent to ensure she understood. Because the record evidence supported the trial court's finding that DHHS accommodated respondent's deficits and made reasonable efforts that included those accommodations, we conclude that it did not clearly err. See *In re Mason*, 486 Mich at 152.

Moreover, while DHHS had a duty to provide accommodations for respondent's deficits, respondent had a commensurate duty to participate in the case service plan. See *In re Frey*, 297 Mich App at 248. The psychologist identified areas where respondent could have worked with DHHS to overcome the barriers presented by her deficits; however, respondent did not.

Caseworker Katie Brooks testified that respondent failed to take the necessary steps to be drug tested, and she even refused an in-person test after that option was offered to her. On the other hand, respondent testified that she complied with the requirements for drug testing, but was repeatedly turned away by the testing agency. Respondent further denied that she refused to accept DHHS's offer of in-person testing, adding that Brooks refused to accommodate respondent by traveling to her location. In light of these conflicting versions, the trial court had to determine which it would credit. The trial court found respondent's testimony lacked credibility. The trial court was in the best position to judge respondent's credibility and this Court will not second-guess its assessment of her credibility. See *In re Miller*, 433 Mich 331, 337-338; 445 NW2d 161 (1989).

The same is true of respondent's claim that DHHS failed to better accommodate her difficulties with literacy, preventing her from making progress with the case service plan. Respondent points to Britten's failure to better explain the call-in process, alleging that this hampered her ability to engage with the drug testing process. But respondent testified that she fully complied with the drug testing requirements and was only prevented from testing because she did not have photographic identification when she went to take the test. She further blamed DHHS for her inability to test on the ground that DHHS failed to solve the problem with the testing agency. Consequently, respondent's own testimony established that the failure to drug test had nothing to do with Britten's purported failure to better explain the testing procedures.

Respondent also testified that no one helped her with reading documents, which contravened the trial court's order for accommodations. Respondent's testimony again directly conflicted with Britten's testimony. The trial court resolved that dispute in favor of DHHS, and respondent has not established grounds for overcoming the deference that this Court owes to the trial court's resolution of that dispute.[4] See *id*.

Affirmed.

/s/ Anica Letica
/s/ Jane E. Markey
/s/ Colleen A. O'Brien

---

[4] Respondent does not otherwise challenge the trial court's determinations regarding the statutory grounds supporting termination or the children's best interests.