*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. M. DAVIS, Minor.

UNPUBLISHED
September 23, 2025
1:21 PM

No. 367134
Wayne Circuit Court
Family Division
LC No. 2009-488130-NA

Before: GARRETT, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

This case concerns respondent's youngest child, JMD. Respondent has battled mental-health difficulties since childhood. Before she gave birth to JMD, respondent's mental-health struggles resulted in the termination of her parental rights to three of her children. Unfortunately, those struggles persisted and resulted in the termination of her parental rights to JMD as well. She appeals by right the trial court's order terminating her parental rights to JMD under MCL 712A.19b(3)(c)(*i*), (g), and (j). Because petitioner, the Department of Health and Human Services (DHHS), provided reunification services that accommodated respondent's mental-health disabilities, and termination of respondent's parental rights was in JMD's best interests, we affirm.

## I. FACTUAL BACKGROUND

In 2005, respondent gave birth to AB. The Clare County Circuit Court terminated respondent's parental rights to AB in 2007. In 2009, respondent gave birth to PHM. DHHS removed PHM from respondent's care the month following his birth, but returned him to respondent's care in 2011. In 2012, respondent gave birth to AMD. DHHS removed both PHM and AMD from respondent's care in 2013, and the Wayne County Circuit Court terminated respondent's parental rights to both children the same year. Over the years, DHHS provided numerous services to assist respondent, and respondent participated in numerous court-ordered and voluntary services. However, her children remained at risk in her care because of her serious mental-health issues. Respondent has been diagnosed with bipolar disorder, borderline personality disorder, anxiety, obsessive-compulsive disorder, schizophrenia, and attention deficit hyperactivity disorder.

-1-

On appeal, this Court affirmed the termination of respondent's parental rights to PHM and AMD. *In re McCarver/Davis Minors*, unpublished per curiam opinion of the Court of Appeals, issued June 17, 2014 (Docket No. 319052). In that appeal, we discussed respondent's repeated neglect of her children as well as her verbal and physical abuse of them. She routinely failed to feed AMD, resulting in his numerous hospital visits. She also left him in a car seat for extended periods of time, which caused him to suffer from a "flat head," resulted in significant gross motor delays, and rendered him unable to bear any weight on his legs. Respondent also restrained PHM in a car seat or on a harness in the house although he was able to crawl and walk. Despite DHHS providing respondent with "a plethora of very intensive services," she failed to make any progress, and service providers, doctors, and mental-health professionals agreed that she was unable "to adequately care for herself without assistance, and would not be able to care for her children even with assistance." *Id.* at 2.

Shortly after JMD's birth in December 2019, respondent agreed to a voluntary safety plan pursuant to which JMD was removed from respondent's care and temporarily placed with the grandmother of PHM and AMD. The following month, DHHS petitioned to terminate respondent's parental rights to JMD. The trial court authorized the petition, and DHHS placed JMD in a foster home, where she remained throughout the trial court proceedings.

The adjudication trial on the petition was delayed for a significant period of time because of the COVID-19 pandemic and respondent's initial desire to conduct the trial in person. In the interim, the trial court ordered DHHS to pay for any parenting classes in which respondent chose to participate. Respondent completed a parenting class and began participating in Infant Mental Health (IMH) services. The adjudication trial commenced in April 2021, and, in June 2021, the trial court accepted respondent's conditional no-contest plea regarding statutory grounds for jurisdiction and termination. The trial court ultimately determined, however, that it was not in JMD's best interests to terminate respondent's parental rights at that time. Consequently, the trial court ordered respondent to comply with, and benefit from, a case service plan that required her, in relevant part, to participate in parenting classes; undergo psychological and psychiatric evaluations; participate in mental-health services; participate in visitation with JMD; and obtain suitable housing separate from her boyfriend, Robert Murray, who was a registered sex offender.

Between November 2021 and January 2023, respondent generally complied with her case service plan and continued to participate in services. However, concerns remained regarding the suitability of her housing, whether she sufficiently benefited from services and was capable of caring for JMD independently, and her limited in-person visitation with JMD because of COVID-19 protocols and the cancellation of visits at the request of respondent, the foster-care worker, or JMD's foster mother. Accordingly, in February 2023, DHHS filed a supplemental petition to terminate respondent's parental rights. Following the termination hearing, the trial court determined that there existed statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). The trial court also determined that termination was in JMD's best interests. This appeal followed.

## II. REUNIFICATION EFFORTS AND ACCOMMODATIONS

On appeal, respondent does not challenge the statutory bases on which the trial court relied when it terminated her parental rights to JMD. Instead, she argues that DHHS failed to make

reasonable efforts toward reunification because its employees failed to sufficiently assist her in obtaining suitable housing in light of her psychological and mental-health disabilities. We disagree. The record shows that DHHS made sufficient efforts to assist respondent in obtaining suitable housing, but that respondent failed to follow through with referrals and otherwise failed to take advantage of the services provided to her.

We review for clear error the trial court's findings regarding reasonable reunification efforts. *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021) (quotation marks and citation omitted).

"The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009). DHHS "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Atchley*, 341 Mich App 332, 338-339; 990 NW2d 685 (2022) (quotation marks and citation omitted). The parent must not only participate in services, but also demonstrate a benefit from the services provided. *Id.* at 339.

Additionally, DHHS "has obligations under the [Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*] that dovetail with its obligations under the Probate Code." *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017). "[E]fforts at reunification cannot be reasonable under the Probate Code if the [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Id.* Although DHHS "cannot accommodate a disability of which it is unaware," once it has knowledge of a parent's disability, its duty to make reasonable reunification efforts means that it cannot "be passive in its approach as far as the provision of accommodations is concerned." *Id.* at 87-88 (quotation marks, citation, brackets, and ellipsis omitted).

In this case, DHHS was well aware that respondent suffered from several mental-health disabilities. However, the record does not support respondent's claim that DHHS failed to provide her adequate, specialized housing assistance in light of her psychological and mental-health disabilities. Indeed, the termination hearing testimony directly contradicts respondent's claim. The foster-care worker, Paige Lawrence, testified that she provided respondent numerous housing-related resources, including sending her applications for housing commissions and waiting lists for Section 8 housing. When respondent expressed that she needed additional help, Lawrence personally helped respondent to the extent that she was able to do so and thereafter provided her phone numbers for resource providers who could give her more in-depth, individualized assistance. There is no indication that respondent contacted the resource providers.

In addition, Lawrence testified that respondent's assigned parent partner, Lorina Effinger, provided respondent housing-related resources and helped respondent obtain personal identification documents necessary to apply for housing. However, according to Effinger, respondent did not follow through with the housing resources provided to her. While DHHS must make reasonable efforts to provide services aimed to accomplish reunification, "there exists a

commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

Although respondent testified that neither Lawrence nor Effinger provided her adequate help to obtain housing, the trial court clearly believed DHHS's witnesses rather than respondent, and "[w]e must defer to the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted). Further, the trial court itself provided respondent contact information for housing resources on more than one occasion, but the record fails to indicate that respondent ever utilized those additional resources. Though the trial court's provision of housing resources does not directly bear on the adequacy of the services that DHHS provided, respondent's failure to follow through with the resources that the trial court provided demonstrates her general lack of follow-through with respect to housing services.

Moreover, although respondent challenges only the adequacy of housing-related services on appeal, housing was not the only barrier to reunification. DHHS also provided respondent ample resources to address the other barriers, which included respondent's ongoing mental-health struggles and inability to adequately care for JMD independently. Considering the foregoing, we are not left with a definite and firm conviction that DHHS failed to meet its duty to provide adequate reunification services that reasonably accommodated respondent's mental-health disabilities. *Hicks/Brown*, 500 Mich at 86-88.

## III. BEST INTERESTS

Respondent next argues that termination of her parental rights was not in JMD's best interests. Again, we disagree. The record shows that termination of respondent's parental rights was in JMD's best interests for several reasons.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Rippy*, 330 Mich App 350, 360; 948 NW2d 131 (2019) (quotation marks and citation omitted). "The focus at the best-interest stage has always been on the child, not the parent." *Atchley*, 341 Mich App at 346 (quotation marks and citations omitted).

> In assessing a child's best interests, a trial court may consider such factors as a child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. The trial court may also consider how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all. [*In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020) (quotation marks, citations, and brackets omitted).]

The trial court may consider the entire record when making its best-interest determination. *Sanborn*, 337 Mich App at 276. We review the court's determination for clear error. *Id*. The trial court must find that termination is in the child's best interests by a preponderance of the evidence. *Id*.

The record shows that respondent's parenting ability was poor despite her participation in numerous parenting-related services. During the lower court proceedings, respondent participated in parenting classes, IMH services, and supportive visitation services. However, by the time of the termination hearing, Lawrence still had concerns regarding respondent's ability to parent JMD and did not believe that she would be able to safely care for JMD without supervision. According to Lawrence, the IMH and supportive visitation workers often had to redirect respondent while she was interacting with JMD, and she required supervision when changing JMD's diaper. Respondent struggled to remain focused on JMD during visits and engaged in age-inappropriate conversations in front of JMD. In addition, respondent occasionally had loud outbursts while visiting JMD, and her ability to control her outbursts did not improve over the course of the lower court proceedings. Lawrence expressed concern regarding the impact of respondent's mental-health conditions on her ability to parent JMD.

Moreover, both respondent and Lawrence testified that respondent had to be told to bring food, toys, and diapers for JMD during visitation. The IMH worker, Glendoria Colson, repeatedly expressed her doubt regarding respondent's ability to care for a young child and her concern that JMD could be physically or mentally harmed if returned to respondent's care. Although respondent's friend, Norma Ballard, testified that respondent successfully babysat Ballard's minor grandchildren, and the court-ordered psychological evaluation indicated that respondent demonstrated a good understanding of parenting techniques, the record does not indicate that respondent possessed the parenting skills necessary to provide long-term, unsupervised care for JMD.[1] Respondent's visitation with JMD never even progressed beyond unsupervised visitation.

DHHS also presented evidence of JMD's need for permanency, stability, and finality. By the time that the trial court concluded the termination hearing, JMD was 3½ years old and had been in foster care for all but the first few weeks of her life. Lawrence expressed concern regarding the length of time that JMD had been in care and testified that she needed permanency. For her part, respondent acknowledged that 3½ years was "too long" for JMD to be without permanency. Although respondent expressed her desire to provide JMD permanency, there is no indication that she would be able to do so. Respondent experienced the same or similar barriers to reunification years previously regarding her other children.

Moreover, there were several advantages to JMD's foster home, as opposed to respondent's home. Lawrence testified that JMD was doing well in her foster home; her foster mother, Kimberly Allen, met all of JMD's needs; JMD was bonded with Allen; JMD looked to Allen for comfort; Allen was willing to adopt JMD, and the foster home was the "best place" for JMD. Allen managed JMD's numerous health conditions, including JMD's developmental delays early in her

---

[1] Notably, Ballard also had a Child Protective Services history and testified that she felt comfortable with Murray around her grandchildren despite knowing that he was a registered sex offender.

life. As previously stated, the trial court may properly consider the advantages of the foster home over the parent's home when making its best-interest determination. *Mota*, 334 Mich App at 321.

Further, although respondent complied with most of the requirements of her case service plan and participated in numerous services, she failed to demonstrate a benefit from her services such that JMD could be safely returned to her care. She continued to reside with Murray, a registered sex offender, despite her receipt of numerous housing-related services and her knowledge that JMD could not be returned to her care until she found housing separate from Murray. Although respondent testified a few weeks before the trial court terminated her parental rights that a potential housing opportunity might materialize within the following few weeks, respondent presented no concrete plan. Additionally, concerns remained regarding respondent's mental health issues on her ability to parent, despite her receipt of regular mental-health treatment since 1995. Notably, respondent began receiving reunification-related services regarding her other children as far back as 2007, but she failed to demonstrate a sufficient benefit from those services to preserve her parental rights to those children. At the present termination hearing, Lawrence expressed concern regarding whether respondent benefited from the services provided to her and believed there were no additional services that could be provided that would allow respondent to be reunified with JMD within a reasonable amount of time. Thus, notwithstanding that respondent participated in numerous services, her failure to adequately benefit from them is entitled to more weight than her participation.

Finally, although the record indicates that respondent had a bond with JMD, considering the best-interest factors outlined in *Mota*, the foregoing facts weighed in favor of termination despite the bond. As such, the trial court did not clearly err by determining that a preponderance of the evidence showed that termination of respondent's parental rights was in JMD's best interests. *Sanborn*, 337 Mich App at 272-273.

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney

-6-